UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN KELLEHER ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DREAM CATCHER, L.L.C., et al., ) <br> ) <br> Defendants. ) <br> ) | Case No. 1:16-cv-02092 (APM) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiff Stephen Kelleher contracted with Defendant Dream Catcher to renovate his home in Washington, D.C., in July of 2014. Dream Catcher never completed the work, forcing Plaintiff to hire other contractors to finish the job. Plaintiff contends that Dream Catcher breached the contract by missing deadlines and ultimately abandoning the project. Dream Catcher and its owners, Defendants Heidi Schultz and Cesar de Armas, maintain that events outside of their control caused delays on the project, and that Plaintiff prohibited Dream Catcher from completing the work. Defendants Schultz and De Armas also assert that they cannot be held liable for any corporate debts of Dream Catcher, which is now insolvent.

Defendants have moved for summary judgment only on the question of whether Plaintiff can pierce the corporate veil, while Plaintiff seeks summary judgment as to all claims. For the following reasons, Defendants' Motion is denied, and Plaintiff's Motion is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

Defendant Dream Catcher LLC ("Dream Catcher") was a District of Columbia limited liability entity incorporated in April 2014 and dissolved in December of 2015. Defs.' Mot. for Summ. J., ECF No. 57 [hereinafter Defs.' Mot.], Defs.' Stmt. of Undisputed Material Facts, ECF No. 57 at 4–6 [hereinafter Defs.' Facts], ¶¶ 1, 24; Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 60 [hereinafter Pl.'s Opp'n], Pl.'s Opp'n Facts, ECF No. 60 at 1–10 [hereinafter Pl.'s Opp'n Facts], ¶¶ 1, 24; Pl.'s Mot. for Partial Summ. J., ECF No. 58 [hereinafter Pl.'s Mot.], Pl.'s Stmt. of Undisputed Material Facts, ECF No. 58-1 [hereinafter Pl.'s Facts], ¶ 48; Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J., ECF No. 61 [hereinafter Defs.' Opp'n], Defs.' Opp'n Facts, ECF No. 61-1 [hereinafter Defs.' Opp'n Facts], ¶ 48. Defendants Cesar de Armas and Heidi Schultz, who are married, were the sole members of Dream Catcher. Defs.' Facts ¶ 2; Pl.'s Opp'n Facts ¶ 2; Pl.'s Facts ¶ 43; Defs.' Opp'n Facts ¶ 43. Dream Catcher's business address was the personal home maintained by the couple and their family. Pl.'s Facts ¶¶ 44, 46, 47; Defs.' Opp'n Facts ¶¶ 44, 46, 47.

On July 14, 2014, Plaintiff Stephen Kelleher entered into a contract with Dream Catcher ("the contract") to renovate his home in Washington, D.C. Pl.'s Facts ¶¶ 2–3; Defs.' Opp'n Facts ¶¶ 2–3. Plaintiff paid Dream Catcher approximately $175,000 for this work, including a $44,000 payment for cabinets, a skylight, and other materials. Pl.'s Facts ¶¶ 13, 37; Defs.' Opp'n Facts ¶¶ 13 (not disputing the amount of the $44,000 payment or its purpose), 37; Pl.'s Mot., Ex. 2, ECF No. 58-6 [hereinafter Pl.'s Ex. 2], at 2. The parties agreed that the work would be substantially completed within "approximately 3 months" of July 21, 2014, with delays permitted for certain specified causes. Pl.'s Facts ¶ 4; Defs.'s Opp'n Facts ¶ 4 (not disputing the content of the contract);

2

Pl.'s Mot., Ex. 1, ECF No. 58-5 [hereinafter Pl.'s Ex. 1], at 2. The contract also included an express warranty for all labor and materials used in the project. Pl.'s Facts ¶ 5; Defs.' Opp'n Facts ¶ 5; Pl.'s Ex. 1 at 8.

Nearly a year later, the project remained incomplete. In early June of 2015, De Armas and Plaintiff arranged to meet with the project architect to determine "what it would take for [De Armas] to complete the job." Pl.'s Facts ¶ 14; Defs.' Opp'n Facts ¶ 14. De Armas did not show up for the meeting. Pl.'s Facts ¶¶ 7–8, 15; Defs.' Opp'n Facts ¶¶ 7–8, 15. Plaintiff then noticed his intent to terminate the contract and gave Defendants an opportunity to cure asserted deficiencies, but Defendants never responded. Pl.'s Facts ¶¶ 21–25; Def.'s Opp'n Facts ¶¶ 21–25. Plaintiff formally terminated the contract in August 2015. Pl.'s Mot., Pl.'s Ex. 47, ECF No. 58-13. Plaintiff then hired a replacement contractor, to whom he paid an additional $123,824.41 for construction and renovation work and to complete work left outstanding by Dream Catcher. Pl.'s Facts ¶¶ 29, 37; Defs.' Opp'n Facts ¶¶ 29, 37.

De Armas and Schultz dissolved Dream Catcher in December 2015. Pl.'s Facts ¶ 49; Defs.' Opp'n Facts ¶ 49. At that time, the company's initial financing—a $50,000 business line of credit for which Schultz was a personal guarantor, and a $55,000 second mortgage on Schultz's Washington, D.C. home—was fully expended. Defs.' Facts ¶¶ 4, 20; Pl.'s Opp'n Facts ¶¶ 4, 20; Pl.'s Facts ¶¶ 78, 79; Defs.' Opp'n Facts ¶¶ 78, 79. Dream Catcher also had outstanding debts, including back wages, which Schultz eventually paid with proceeds from the sale of her home. Pl.'s Facts ¶¶ 75–79; Defs.' Opp'n Facts ¶¶ 75–79.

Dream Catcher undertook three construction projects in its short life: the Kelleher project, another residential renovation in Alexandria, Virginia, and a restaurant renovation in Washington, D.C. Pl.'s Facts ¶¶ 57–58; Defs.' Opp'n Facts ¶¶ 57–58. Dream Catcher completed

none of the three projects, and each owner told Dream Catcher not to return to complete the work. Pl.'s Facts ¶¶ 72–74; Defs.' Opp'n Facts ¶¶ 72–74.

### B. Procedural Background

Plaintiff originally brought this suit in D.C. Superior Court in May 2016. *See* Notice of Removal, ECF No. 1 [hereinafter Notice of Removal], First Compl., ECF No. 1-1. Defendants removed to this court in October 2016. *See* Notice of Removal.

This court previously granted in part and denied in part Defendants' Motions to Dismiss, leaving in place Plaintiff's claims for (1) breach of contract, (2) breach of warranty, (3) unjust enrichment, (4) breach of implied covenant of good faith and fair dealing, and (5) unlawful trade practices. *See* Am. Compl., ECF No. 13; *see also Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322 (D.D.C. 2017). The question of whether Plaintiff can pierce the corporate veil to hold individual defendants De Armas and Schultz liable for Dream Catcher's actions also remains before the court. *Kelleher*, 263 F. Supp. 3d at 324–26.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015). In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

4

242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in [his] favor," then summary judgment is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV. DISCUSSION

### A. Piercing the Corporate Veil

The court begins with the question of whether Plaintiff can pierce the corporate veil, an issue on which both parties move for summary judgment. *See* Defs.' Mot. at 8–12; Pl.'s Mot., Pl.'s Mem. For Summ. J., ECF No. 58-2 [hereinafter Pl.'s Mem.], at 5–6. For the following reasons, the court denies both parties' motions on this issue.

"The general rule is that a corporation is regarded as an entity separate and distinct from its shareholders." *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000). However, the D.C. Circuit has found it appropriate to pierce the corporate veil when "the corporation, rather than being a distinct, responsible entity, is in fact the alter ego or business conduit of the person in control." *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982). Courts generally inquire as to (1) "whether corporate formalities have been observed," (2) "whether there has been commingling of corporate and shareholder funds, staff and property," (3) "whether the corporation is adequately capitalized," (4) "whether a single shareholder dominates the corporation," and (5) "whether the corporate form has been used to effectuate a fraud." *Ruffin v. New Destination, LLC*, 773 F. Supp. 2d 34, 40 (D.D.C. 2011) (quoting *Lawlor*, 758 A.2d at 975). No single factor is dispositive. *Lawlor*, 758 A.2d at 975. The question of whether the corporate veil should be pierced is generally one for a jury. *See Vuitch v. Furr*, 482 A.2d 811, 816 n.6 (D.C. 1984).

### 1. Corporate Formalities Observed

The court begins with the first factor: whether Defendants disregarded corporate formalities. In support of this factor, Defendants emphasize that Dream Catcher was duly formed, maintained separate financial accounts, kept separate business records, and hired and paid employees. *See* Defs.' Mem. at 9. The evidence, however, is at best ambiguous as to Defendants' corporate practices.

The evidence supports Dream Catcher's separate legal existence, *see* Defs.' Facts ¶¶ 1-2; Pl.'s Opp'n Facts ¶¶ 1–2, as well as corporate bank accounts for the company. *See* Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 63 [hereinafter Defs.' Reply], Defs.' Ex. A, ECF No. 63-1 (attaching banking records). But Defendants' management and maintenance of business records remains unclear. *See TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 67 (D.D.C. 2011) (finding uncertain whether defendants followed corporate formalities where questions remained about corporate recordkeeping). Defendants supplied little evidence concerning the records kept during the Kelleher project, with Schultz testifying that she did not know whether Quickbooks records for the project still existed but that Dream Catcher's former business manager, Natalie Cooper-Berthe, "might" have them. Pl.'s Facts ¶ 56; Defs.' Opp'n Facts ¶ 56; Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J., ECF No. 62 [hereinafter Pl.'s Reply], at 6. Moreover, Defendants could not provide a clear answer as to who was even keeping records during the Kelleher project. Schultz and De Armas stated that Cooper-Berthe oversaw Dream Catcher's finances and began work "way before Christmas of 2014." *See* Defs.' Mot., De Armas Depo., ECF No. 57-2 [hereinafter De Armas Depo.], at 24, 58; Schultz Depo., ECF No. 57-1 [hereinafter Schultz Depo.], at 30–31, 41. However, in an email, Cooper-Berthe stated that she had recently begun managing Dream Catcher's money as of April 2015,

months after the Kelleher project started in July 2014. Pl.'s Mot., Pl.'s Ex. 53, ECF No. 58-14 [hereinafter Pl.'s Ex. 53], at 20–21. Thus, the record is murky as to who at Dream Catcher was keeping records during 2014 and early 2015 on the Kelleher project.

An additional factor that weighs against Defendants is that Dream Catcher had no separate business address and instead used De Armas's and Schultz's home address as its business address. Pl.'s Facts ¶¶ 44, 46–47; Defs.' Facts ¶¶ 44, 46–47. To be sure, it is not uncommon for a small business to use a residential address. But the fact that Dream Catcher did not have its own business address, when viewed in light of the lack of evidence on corporate recordkeeping practices, could reasonably be construed to suggest a lack of division between the corporation and De Armas and Schultz. *See Vuitch*, 482 A.2d at 817 (business using home address one indication of lack of corporate formalities). Thus, on the present record, there remains a genuine dispute of material fact as to whether Dream Catcher adhered to corporate formalities. *See TAC-Critical Sys., Inc.*, 808 F. Supp. 2d at 67–68 (denying summary judgment where the defendant presented no evidence of record-keeping and stated that all relevant documents had been "thrown away" or had been damaged).

### 2. Commingling of Funds

A genuine dispute of material fact also exists as to whether De Armas and Schultz kept separate Dream Catcher's assets from their personal funds. There is evidence of possible commingling. First, Defendants paid business expenses from funds obtained through a second mortgage on Schultz's personal residence. Pl.'s Facts ¶ 79; Defs.' Opp'n Facts ¶ 79. They also paid additional business expenses, including past-due wages, with funds from the sale of Schultz's personal residence in February 2016, after dissolving Dream Catcher. Pl.'s Facts ¶¶ 76–79; Defs.' Opp'n Facts ¶¶ 76–79; Schultz Depo. at 51, 70–72. Although a gift or loan of personal funds from

an owner to a business endeavor is not necessarily commingling, *see Winmar Constr., Inc. v. Kasemir*, 233 F. Supp. 3d 53, 63 (D.D.C. 2017), there is also evidence that Defendants borrowed $2,000 from the owner of another renovation project for personal use, *see* De Armas Depo. at 49–50; Pl.'s Facts ¶ 60; Defs.' Facts ¶ 60. How that loan was repaid, if at all, is not clear from the record. On the other hand, Dream Catcher had checks in its own name. Defs.' Reply, Ex. A. Neither party, however, presented evidence as to whether Dream Catcher and the individual Defendants maintained separate credit accounts. Based on this mixed record, the court cannot conclusively determine whether Dream Catcher comingled funds.

3. *Adequate Capitalization*

Whether Dream Catcher was adequately capitalized is in dispute. At the start of the Kelleher project, the company had access to $105,000 by way of (1) a $55,000 second mortgage and (2) a $50,000 business line of credit. Defs.' Mot. at 11; Defs.' Facts ¶¶ 4, 5; Pl.'s Facts ¶¶ 78, 79.[1] Plaintiff hired Dream Catcher for a remodel expected to cost around $140,000. Defs.' Mem. at 11; Defs.' Facts ¶ 8; Pl.'s Opp'n Facts ¶ 8. At the same time, Dream Catcher was working concurrently on two other projects whose values the parties have not disclosed. Pl.'s Facts ¶¶ 57–58; Defs.' Opp'n Facts ¶¶ 57–58.

There is some indication that the funds to which Dream Catcher did have access were not adequate. Dream Catcher delayed paying its workers for months, and ultimately Schultz paid these business expenses using proceeds from the sale of her home. Pl.'s Facts ¶¶ 76–79; Defs.' Opp'n Facts ¶¶ 76–79. De Armas received a loan from the owner of one renovation project for personal use after "issues" with a third project resulting in delayed payment to Dream Catcher. *See* Schultz Depo. at 62; De Armas Depo. at 49–50; Pl.'s Facts ¶ 60; Defs.' Opp'n Facts ¶ 60. De Armas also

---

[1] The $55,000 second mortgage on Schultz's personal residence was used to pay personal *and* business expenses. *See* Schultz Depo. at 74–75.

bounced a check on behalf of Dream Catcher to at least one vendor for cabinets for the Kelleher project, and there is evidence that Dream Catcher had difficulty making timely payments to the project's architect, even though Plaintiff had made sufficient payments to Dream Catcher. *See* Freeman Depo., ECF No. 58-11, at 87; Pl.'s Reply at 5; Pl.'s Reply, Pl.'s Ex. 55 to 60, ECF No. 62-2 to 62-7. Further, Dream Catcher undertook three projects during its year-and-a-half existence and never completed any of them. Pl.'s Facts ¶¶ 72–74; Defs.' Opp'n Facts ¶¶ 72–74. There is also no record evidence as to how much would have been an adequate amount to capitalize a business of Dream Catcher's size. *See Labadie*, 672 F.2d at 99 ("Whether capitalization is adequate is understandably a function of the type of business in which the corporation engages."). On these facts, the court cannot say whether Dream Catcher was or was not adequately capitalized.

    4.    *Domination by one Shareholder*

Defendants argue that no single shareholder dominated the corporation, as both Schultz and De Armas were owners. Defs.' Reply at 3. But that fact alone does not inoculate them against veil piercing. *See Vuitch*, 482 A.2d at 817, 820 (finding corporate veil pierced where the sole shareholders of multiple corporations was a couple).

    5.    *Fraud*

Plaintiff does not allege that the individual defendants used Dream Catcher to defraud him. A showing of fraud, however, is not necessary to pierce the corporate veil. *See Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 93 (D.C. 1994).

    \*        \*        \*

For the reasons discussed, there remain genuine issues of material fact as to whether Dream Catcher observed corporate formalities, commingled funds, and was adequately capitalized. Accordingly, both Motions for Summary Judgment on the issue of alter ego liability are denied.

B.     Breach of Contract

The court now turns to Plaintiff's breach of contract claim.[2] To prevail on a breach of contract claim, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). Here, the only element in dispute is whether Defendants' failure to complete the project breached their duties under the parties' agreement. An unjustified abandonment of work plainly constitutes a breach of contract. "Once a contractor has agreed to perform work, it must comply with its obligations under the contract, unless those obligations are excused by some legally effective cause." James Acret and Annette D. Perrochet, Construction Litigation Handbook 3d § 9:2 (3d ed.); *see also Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 729 (D.C. 2003) (stating that a breach of contract is "an unjustified failure to perform all or any part of what is promised in a contract") (citation omitted).

Here, the undisputed facts establish that Defendants did not complete the agreed-upon work. Pl.'s Facts ¶ 7; Defs.' Opp'n Facts ¶ 7. The parties' contract, dated July 14, 2014, specified that the project would be substantially completed within "approximately 3 months," not including various time allowances for specified delays.[3] Pl.'s Ex. 1 at 2. Nearly a year after the agreement, Dream Catcher still had not finished the work.

Defendants also admit that they received opportunities to complete the work but did not do so. In June 2015, Plaintiff and De Armas agreed to meet to discuss a new schedule for Dream Catcher to finish the work. *See* Pl.'s Facts ¶ 15; Defs.' Opp'n Facts ¶ 15. No one from Dream

---

[2] Previously, the court had deferred ruling on whether to dismiss Plaintiff's quantum meruit claim because it was unclear whether Defendants admitted the existence of a contract. *See Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 326 (D.D.C. 2017). Defendants do not now contest the existence of a contract. *See* Pl.'s Facts ¶¶ 2–3; Defs.' Opp'n, Facts ¶¶ 2–3. Accordingly, Plaintiff's quantum meruit claim is dismissed.

[3] Delays set forth in the contract included: "holidays, inclement weather, accidents, shortage of labor or materials, additional time required for completion of Change Order work (as specified in each Change Order), delays caused by Owner, and other delays unavoidable or beyond the control of the Contractor[.]" Pl.'s Ex. 1 at 2.

Catcher showed up. *See id.* Then, in July 2015, Defendants received a letter from Plaintiff's counsel, dated July 7, 2015, which constituted Plaintiff's notice of intent to terminate the contract. *See* Pl.'s Facts ¶ 24; Defs.' Opp'n Facts ¶ 24; Pl.'s Mot., Pl.'s Ex. 45, ECF No. 58-13. The letter detailed multiple alleged breaches of contract, including "[f]ailing to achieve Substantial Completion within the Contract Time," and "[a]bandoning the project," and provided that, "[i]f you believe that Dream Catcher is capable of curing all material breaches of contract within seven days, please contact me immediately to discuss Dream Catcher's plan to cure it breaches." Pl.'s Ex. 45 at 1–2. Defendants did not respond to the letter. *See* Pl.'s Facts ¶ 24; Defs.' Opp'n Fact ¶ 25. Defendants also admit to receiving a second letter from Plaintiff's counsel, dated July 30, 2015, announcing Plaintiff's intent to terminate the contract. *See* Defs.' Opp'n Fact ¶ 24; Pl.'s Mot., Pl.'s Ex. 46, ECF No. 58-13. That letter advised that Plaintiff "intends to terminate the contract in 7 days for any and all uncured breaches and violations of law." Pl.'s Ex. 46 at 2. Defendants did not respond to this letter, either. *See* Pl.'s Facts ¶ 25; Defs.' Opp'n Fact ¶ 25. Plaintiff formally terminated the contract by letter dated August 11, 2015. Pl.'s Mot., Pl.'s Ex. 47. At that time, a substantial amount of work remained unfinished. Pl.'s Mot., Pl.'s Ex. 6, ECF No. 58-9, at 1–3.

Nor is there reason to believe that Defendants could have completed the job. Defendants admit that they performed no work on any other project after performing their last work on Plaintiff's home due to De Armas's upcoming spinal surgery. Defs.' Opp'n Facts ¶ 62.

All of these undisputed facts establish that Defendants abandoned Plaintiff's project and therefore breached the parties' agreement. *See U.S. for Use & Benefit of Heller Elec. Co. v. William F. Klingensmith, Inc.*, 670 F.2d 1227, 1231 (D.C. Cir. 1982) (holding that sub-contractor breached contract when it "failed to return to the job," "failed to notify [the contractor] of its

11

intentions regarding completion of the work," and "was working on another project when it was supposed to be working on [the project at issue]").

Defendants make a half-hearted attempt to justify their actions. Defendants blame their failure to complete the project on "delays which were not the fault of Dream Catcher." Defs.' Opp'n at 2. *Cf.* Construction Litigation Handbook 3d § 9:2 ("The most frequent event that may legally justify abandonment of work is a material and unexcused breach of contract by the other party."). Defendants claim that the delays were caused by a variety of issues: staffing difficulties, incorrect structural drawings, a crumbling existing structure, Plaintiff's failure to make timely decisions about finishes, and weather. Defs.' Opp'n Facts ¶¶ 7, 11. Defendants have not, however, supplied any proof—including expert testimony—to create a genuine dispute of material fact that these claimed delays in fact prevented them from completing the project. *Cf. Mergentime Corp. v. Washington Metro. Area Transp. Auth.*, No. CIV. 89-1055 TFH, 2006 WL 416177, at *75 (D.D.C. Feb. 22, 2006) (stating, in a government contracts case, that "when a contractor abandons work under a contract, it has the burden to prove that its inaction is contractually excusable or due to the government's material breach of the contract"); *see also Morganti Nat., Inc. v. United States*, 49 Fed. Cl. 110, 132 (2001), aff'd, 36 F. App'x 452 (Fed. Cir. 2002) (holding that, in the context of government contracts, a contractor "has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby") (citation omitted). Defendants never explain how long each specific issue delayed the project or why those issues collectively created such an extended and unreasonable delay. Further, a major cause of delays—the lack of adequate project staff—was Defendants' responsibility. *Cf. Aptus Co. v. United States*, 61 Fed. Cl. 638, 648 (2004) ("Evidence of inadequate staffing may be posited to show that [contractor]

had not made, and was unable to make, progress under the contract."); *Tr. Title Co. v. United States*, 118 Fed. Cl. 99, 124 (2014) (government was entitled to terminate contract where evidence showed that contractor's delays in performance were "largely caused by inadequate staffing and by its own internal workflow decisions"). At bottom, Defendants offer no explanation for why purported delays outside their control justified their abandonment of the project.

Defendants also assert that "nowhere does the contract provide that time is of the essence." Defs.' Opp'n at 2. But they say no more. Defendants offer no further rationale and cite no authorities to explain why the absence of such a clause matters here. The court is under no obligation to decipher such a cryptic argument. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir.2000) ("It is not this court's responsibility to research and construct the parties' arguments.") (citation omitted). In any event, the mere absence of a "time is of the essence" clause did not preclude Plaintiff from demanding that Defendants complete the project once the 90 days specified in the agreement passed. *See Drazin v. Am. Oil Co.*, 395 A.2d 32, 35 (D.C. 1978) ("If a definite date for performance is specified in the agreement, but performance on time is not of the essence, either party has the power to make on that date or some subsequent date, performance essential and a condition of his own duty by giving notice to that effect, provided that the notice leaves a reasonable time for rendering performance.") (citation omitted). Plaintiff made such a demand, yet Defendants failed to complete the work.

The court finds that Dream Catcher did not fulfill its contractual obligations and was not justified in doing so. The court therefore grants Plaintiff summary judgment on his breach of contract claim.

### C. Other Claims

#### 1. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Plaintiff also claims a breach of the implied covenant of good faith and fair dealing. In the District of Columbia, "every contract contains within it an implied covenant of both parties to act in good faith." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1087 (D.C. 2008). Violations of this covenant include "evad[ing] the spirit of the bargain, lack of diligence and slacking off, willfully rendering of imperfect performance . . . and interference with or failure to cooperate in the other party's performance." *Window Specialists, Inc. v. Forney Enterprises, Inc.*, 106 F. Supp. 3d 64, 89 (D.D.C. 2015) (quoting Restatement (Second) Contracts § 205 cmt. d). Plaintiff is entitled to summary judgment on this breach claim for the same reasons as his general breach of contract claim. *Cf. Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 35 (D.D.C. 2015) (defendants' alleged failure to complete renovations "destroy[ed] the value of the bargain," and was sufficient to state a claim for violation of the implied covenant of good faith and fair dealing).

#### 2. *Breach of Express Warranty*

Plaintiff next moves for summary judgment under the "express warranty for labor and materials provided to the Project." Pl.'s Mem. at 3. The contract contains an express warranty "on all Contractor- and Subcontractor-supplied labor and materials used in this project for a period of one year following substantial completion of all work." Pl.'s Ex. 1 at 8. Substantial completion of the work is a condition precedent to the warranty. Because Dream Catcher never reached substantial completion of the contract, the warranty never came into effect. Plaintiff's motion for summary judgment as to this claim is denied.

### 3. *Unlawful Trade Practices under D.C. Law*

Finally, the court turns to Plaintiff's unlawful trade practices claim under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904. Plaintiff alleges Defendants violated subsections (d) through (f) of the CPPA, which prohibits, in relevant part: representations that goods or services are of a particular quality when they are not, misrepresentations of material fact, and failing to state a material fact if the omission has a tendency to mislead. *See id*. § 28-3094 (d)–(f); Pl.'s Mem. at 4. Plaintiff contends Defendants violated the CPPA by: (1) making false statements or representations about the quality of their work, materials, and services, and failing to provide a property in a "habitable condition [and free] from defects"; (2) "performing defective work and abandoning the project"; and (3) accepting payment from Plaintiff to purchase materials for his renovation but using the funds for unrelated purposes. Pl.'s Mem. at 4.

With regard to the first category of allegations, Plaintiff has not identified any false or misleading statement made by De Armas or Schultz. *See generally* Pl.'s Facts; Pl.'s Opp'n Facts. Without such evidence, Plaintiff cannot prevail on that theory of violation. *See Floyd v. Bank of America*, 70 A.3d 246, 254 (D.C. 2013) (dismissing complaint under CPPA subsection (d) where the plaintiffs "[had] not pointed to any representation(s) that the [b]ank made" that was allegedly misleading); *Grayson v. AT&T*, 15 A.3d 219, 251 (D.C. 2011) (dismissing CPPA subsection (e) and (f) claims where the plaintiff had not "identified any material fact that defendants either stated or failed to disclose").

Plaintiff is likewise not entitled to summary judgment on its second CPPA theory of violation, i.e., that Dream Catcher performed defective work and abandoned the job. Plaintiff cites no authority for the proposition that run-of-mill breaches of contract are actionable under the

15

CPPA. Indeed, courts in this District have interpreted the CPPA as not even reaching cases alleging that "the breach was intended when the contract was formed." *Slinski v. Bank of Am., N.A.*, 981 F. Supp. 2d 19, 36 (D.D.C. 2013); *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 26 (D.D.C. 2019) (same). Here, Plaintiff presents proof of no more than an ordinary breach of contract after the contract's formation. Such evidence cannot sustain a claim under the CPPA.

Finally, Plaintiff claims Defendants violated the CPPA by "accept[ing] payment from Plaintiff for the stated purpose of purchasing materials for the Project and then using said funds for other purposes unrelated to Plaintiff or the Project." Pl.'s Mem. at 4. That theory of liability fails at this stage for at least two reasons. First, it far from clear that mere misuse of funds falls within subsections (d), (e), or (f) of the CPPA. Each requires either a misrepresentation or material omission *by the defendant*, as opposed to a mere payment by a plaintiff tied to a specified purpose that went unfulfilled. Plaintiff has not identified any misrepresentation or material omission made by Defendants in connection with purchase of project materials. Second, there is a genuine issue of material fact as to whether Defendants used the funds for the project or for other purposes. *See* Pl.'s Facts ¶ 13 (stating Plaintiff gave $44,048 to Dream Catcher to purchase cabinets and skylight, but Dream Catcher never purchased the skylight or fully paid for cabinets); Defs.' Opp'n Facts ¶ 13 (citing testimony by De Armas that he believed that Dream Catcher had fully paid for the cabinets). Summary judgment on Plaintiff's CPPA claim is therefore denied.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Defendants' Motion for Summary Judgment is denied. Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

Dated: July 31, 2019

Amit P. Mehta
United States District Judge